The facts in this case are not in dispute. Then only questions involved are of testamentary and statutory interpretation.
Peter T. Haver died in 1909 a resident of New Jersey. He left a will obviously drawn by himself or some scrivener with only a scanty knowledge of the law relative to wills. Under it he gives his homestead farm to his son George for life, and provides further that if at George's death he "should leave any legal heirs" the farm is to go to them; but if George should die, "without leaving any legal heirs," then the farm is to be sold by testator's executors and the proceeds divided among testator's other three sons, John, Peter and Wilson, "their heirs, equally share and share alike forever."
All four of testator's sons survived him. George has recently died; the other three predeceased him, leaving children, who now claim to be entitled to the farm, under the will, as against the defendant Luella Herder, who was legally adopted by George, under our statute, in 1911, but who was in no otherwise related to George.
The issue is as to what testator meant by "legal heirs" of George, and whether or not Luella Herder takes as coming within the class so designated.
It is, of course, clear that testator did not use the words "legal heirs" in their legal or literal meaning. He meant a much narrower or more restricted class, which did not include George's three brothers, because he provides for equitable remainder over to the three brothers if George dies without leaving "legal heirs."
There are a number of decisions in this state holding that by similar words in a will ("heirs" or "lawful heirs"), and, under similar circumstances, testator meant "issue." Among these may be mentioned Baldwin v. Taylor, 37 N.J. Eq. 78; *Page 556 affirmed, 38 N.J. Eq. 637 (at p. 641), and Dean v. Nutley,70 N.J. Law 217 (at p. 219). There are other cases holding that such words are to be construed as meaning "children." See, for instance, Davis v. Davis, 39 N.J. Eq. 13, 14; Eldridge v.Eldridge, 41 N.J. Eq. 89 (at p. 91); Demarest v. Hopper,22 N.J. Law 599 (at p. 611); Howell v. Steelman, 76 N.J. Eq. 423
(at p. 424); affirmed, 77 N.J. Eq. 586.
In none of these cases (nor in any other, so far as I am aware) was there any question involved, or considered, requiring a differentiation between "children" and "issue," nor requiring a determination of the precise point in controversy in the present case, which is, of course, whether by the words "legal heirs" (of a person other than himself) in a will which clearly evidences that testator did not mean such words in their literal sense, and did not mean thereby to include collateral heirs, such as brothers or sisters, testator is, or is not, to be held to mean such a class of persons as would include an adopted child.
It was decided by this court in Stout v. Cook, 77 N.J. Eq. 153
(at p. 165), that by the words "child" or "children" the testator did not mean to include an adopted child. That decision was based on the fact that neither at the time of the execution of the will, nor at testator's death, was there any legislation (either in New Jersey or the state of testator's domicile) providing for the adoption of children, and that hence the testator could not have had adopted children in mind. The decision further holds that the statute, P.L. 1877 p. 123
(which was enacted between the date of testator's death and the date of the suit), did not clothe an adopted child with the right to take under a gift in such a will to "children" — in other words, that the legislature had not undertaken by that statute to alter the testamentary provisions of a will executed and probated prior to the statute.
The decision in Stout v. Cook, supra, however, is neither controlling nor of such assistance in the disposition of the instant case, because the present testator was domiciled in *Page 557 
New Jersey, and at the time the will was executed (1899) the statute of 1877 was in effect (and had been for many years), and at the time of testator's death (1909) our present statute, P.L.1902 p. 259 (which is essentially similar to the statute of 1877), was in effect. Stout v. Cook assuredly in nowise holds or indicates that if the testator had been a resident of New Jersey and our statute, in effect, "children" would not have been interpreted to include an adopted child.
Neither do I find any decision or dictum in the case of Inre Book, 90 N.J. Eq. 549 (on which defendants' counsel strongly relies), which indicates the answer to the question now subjudice. That case was one of statutory, not testamentary, interpretation, involving a distinctly different issue. It holds that the effect of the act of 1902 is to require that the legislative meaning of the words "child," "children" and "issue," where they appear in the various statutes, such as the acts concerning wills, descent and distribution, be enlarged to include adopted children. The court does not say that a similar interpretation is to be given to these words where they appear in testamentary dispositions.
George Haver had no child, adopted or natural born, at the time the will was drawn or at testator's death. It is evident, therefore, that there could have been no intent on the part of testator to benefit persons in being, persons whom he knew, or of whose existence, at least, he knew. In the third paragraph of the will he disposes of another property to the benefit of his four sons, and in this paragraph he provides that the share of one son, Wilson, shall be only a life estate, and the remainder shall go to Wilson's three children, naming them. There are conflicting opinions (see Davis v. Davis, supra — at p. 15) as to the inference to be drawn from the use of the word "heirs" in one place and the use of the word "children" in another, but no valid inference can be drawn either way in the present case, because in using the word "children" he refers to three particular children who were already existent. *Page 558 
Testator's use of the word "heirs" in the place where it secondly appears in the second paragraph of the will, is, at least, equally ambiguous as its use in the first instance, and hence affords us no help.
If in making the gift to George's heirs testator had used the word "heirs" in its technical sense, there would have been no doubt, I take it, as to the result in the present case, since the statute expressly makes the adopted child an heir — a legal heir — of the adopting parent. But we have already seen that testator did not use it in its technical sense.
Can it be said that, although he did not use the word in its technical sense, since he intended to exclude collateral heirs, he must, nevertheless, be deemed to have meant it technically save for that exception? — in other words, that he meant the persons who by law should constitute George's direct heirs — his heirs exclusive of collateral heirs? Such an assumption is possible, but seems to me scarcely warranted, at least, in the case of this particular will.
The available evidence, to my mind, leaves the testator's intent in this behalf entirely uncertain, and necessitates (since the question must be determined one way or another in order that the case may be decided) the adoption of a rule of construction. Such a rule may be formulated as follows: That where a testator, by a will executed and probated during the existence of our statute as to adoption, devises property to a class designated as "heirs," "lawful heirs" or "legal heirs" (in cases where, prior to the statute of adoption, such words would have been held to mean "children" or "children and/or the children of deceased children"), he must be deemed, in the absence of evidence to the contrary elsewhere in the will or surrounding circumstances, to have intended to include within such class children adopted pursuant to such statute, as well as naturalborn children or grandchildren.
(I have not included the word "issue," because that might, perhaps, fairly be taken to mean "heirs of the body," under the express exception provided by the statute, to wit, that an adopted child shall not be capable of taking property *Page 559 
expressly limited to the heirs of the body of the adopting parent or parents.)
Either this rule or its opposite must needs be adopted, and the adoption of the rule as above stated, rather than its opposite, in my view, is in accord with both the spirit of the legislative policy (as indicated in the adoption statute) and the spirit of the judicial pronouncement in the Book Case, supra.
I have hereinbefore stated that the Book Case did not in terms control the determination of the present issue. Perhaps, in view of the tenth section of the statute of descent and the opinion of the court of errors and appeals in Demarest v.Hopper, supra, some explanation should be added.
In the Demarest Case there was a devise to a daughter, and, at her death, to her heirs in equal shares. The court held that the testator by "heirs" meant "children," but also were of opinion (shared by the dissenting member of the court) that the rule in Shelley's Case would operate were it not for the statute now contained in the Descent act as section 10 thereof.
In this view they were mistaken, as has been made clear in the later opinions of the same court. Martling v. Martling,55 N.J. Eq. 771; Lippincott v. Davis, 59 N.J. Law 241; Peer v.Hennion, 77 N.J. Law 693, and Shugrue v. Long,82 N.J. Law 717.
But although the later cases determined that where a remainder was given to a life tenant's heirs, and the word "heirs" was not used by the testator in its technical sense, and was used as a word of purchase, the rule in Shelley's Case would not come into operation even in the absence of the statute, there might have been, until the decision in Shugrue v. Long, supra, uncertainty as to whether the tenth section of the Descent act would apply in such a case — that is to say, in the present case. If it did apply, then the Book Case (the effect of which is to enlarge the meaning of the word "heirs," in that section, to include adopted children) would be controlling. But in the last paragraph of Shugrue v. Long (at p. 723), it is determined that the tenth section *Page 560 
of the Descent act applies only to such cases as would have been controlled, at common law, by the rule in Shelley's Case.
The action was, of course, justifiably brought, and the costs of all parties may be paid out of the estate.